## HARLLEE v. CITY OF GULFPORT.

### No. 9749.

Circuit Court of Appeals, Fifth Circuit.
May 16, 1941.

Rehearing Denied June 9, 1941.

W. L. Guice, of Biloxi, Miss., and Carl Marshall, of Gulfport, Miss., for appellant.

E. J. Ford, of Pascagoula, Miss., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

The City of Gulfport, Mississippi, maintained within its corporate limits a recreational park or playground where children and adults gathered for games and recreation. In the summer of 1938 the business men of Gulfport organized the Gulfport Soft Ball League, and the authorities of

the City granted the League permission to play soft ball games at night at the playground. The City also permitted the League to use its grandstands or bleachers to seat guests. The public was invited to attend the games, and from time to time the City Park Commissioner made inspection of the playground and bleacher seats.

On the evening of June 20, 1938, a soft ball game was in progress at the playground. Miss Mary Rose Bugna and a girl friend attended the game. While they were in search of vacant seats in the grandstands, they walked behind one of the sections which suddenly collapsed and fell upon Miss Bugna, killing her almost instantly. Mrs. H. T. Harllee, a sister of Miss Bugna, qualified and was appointed administratrix of Miss Bugna's estate, and thereafter brought suit against the City of Gulfport for her decedent's wrongful death. The case was tried to a jury, and at the conclusion of all the evidence the court, on motion, directed the jury to return a verdict for the defendant, City of Gulfport. From the judgment entered on the directed verdict the plaintiff has appealed.

The record reveals that the park and its equipment belonged to the City of Gulfport; that the Gulfport Soft Ball League was permitted to use the park and equipment; that no admission was charged to those attending the games; that the public was never advised that the League was in charge of the playground; that the City did not relinquish its control over the park, but maintained an inspection of the park and its equipment; that the grandstand or bleachers when in place were about seven feet high and were of the make and kind that could be knocked down and stored, or moved from place to place at will; that their design permitted quick and ready assemblage; that the main supports of the stand which fell consisted of wooden frames shaped like the letter "A" and known as "A-Frames", made of 2″x4″ pieces of lumber; that the seats, footboards, and other parts were not secured together; that the safety and strength of the stand depended upon the perpendicular press of gravity, straight downward; that any material departure from the perpendicular line, in the way of an uneven foundation or of earth wet, soft, and yielding at one point on which the foundation rested, would imperil the stability of the structure. It is further shown that heavy rains had occurred before the accident; that the rains

and standing water had softened the earth at one end of the stand and caused the end of the supporting frames to sink into the soft and muddy earth; and that such a condition caused or would cause the falling of the stand.

Other evidence disclosed that the footboards or boards connecting the "A-Frames" were not fastened to the stand structure and were not to be found just after the stand fell; that such supports, if not in place, would cause the stand to weaken and would permit it to fall under the weight of persons sitting upon it; that to make the stands safe, boards or planks should have been placed under the ends of the "A-Frames" at the east end of the stand where the earth was soft; that such boards had not been placed under the ends of the "A-Frames" which gave way; that the stands were being used and occupied three or four nights a week; and that if careful and reasonable inspection had been maintained by the City authorities the unsafe condition of the stands would have been disclosed. There was testimony that such inspections had been made by Mr. Ballanger, one of the City Commissioners, but he was unable to say when he made an inspection of the stands before the accident. He was of opinion that he made inspections once a week, but could not give the times or dates. In answer to a question as to the kind of inspection he made, he said, "Yes, in passing them I looked at them". The evidence further shows that the stand fell to the east and north of east; that at that end of the section the supports which rested upon the ground had mud extending up their frames as much or more than fourteen inches. The supports were exhibited to the jury, and the mud which was on the end of the frame had dried and was still on them, showing that they had buried into the soft earth.

It is not necessary to take notice of the amended pleadings whereby members of the Gulfport Soft Ball League were made parties defendant to the suit. It appears that the League members paid the plaintiff $1,000, and that the suit was dismissed as to them. The Court correctly held that the purported release was not a discharge as to the City of Gulfport.

The Court directed a verdict for the City on the ground that the evidence failed to show negligence on its part. This was error.

■ Under the provisions of Sections 2391, 2414, and 2437 of the Mississippi Code of 1930, the City of Gulfport was given full power to own and operate public parks and playgrounds, and maintain jurisdiction over them. As to the liability of a City for its negligence in the maintenance and operation of parks the Supreme Court of Mississippi has followed the New York Rule. In Byrnes v. City of Jackson, 140 Miss. 656, 105 So. 861, 863, 42 A.L.R. 254, the Mississippi Supreme Court said, "It seems to us that the rule making it the duty of the city to exercise reasonable care to make its parks reasonably safe places for people to resort to, and making the city liable for negligence, is the better rule."

■ The City of Gulfport could not escape liability for injuries resulting from negligently created and maintained conditions of the playground and equipment in question by attempting to transfer its responsibility, or delegate its functions and duties to others. City of Jackson v. McFadden, 181 Miss. 1, 177 So. 755; Atkinson v. Town of Decatur, 131 Miss. 707, 95 So. 689; Town of Senatobia v. Dean, 157 Miss. 207, 127 So. 773.

There is evidence to be found in the record that (1) the grandstand in question should have had additional supports in the way of boards or other supports to increase the resistance of ground area under the ends of the "A-Frames" on the east end of the stand; that (2) the collapse of the grandstand was due to the absence of footboards connecting the different "A-Frames", which absence weakened the stand's resistance to strain and caused it to give way and fall; and that (3) the City failed to inspect the park equipment, and that the Commissioner entrusted with that duty failed to make a careful and reasonable inspection.

■■ The members of the public who attended the soft ball games at the City playground had a right to rely upon the City of Gulfport having made faithful, efficient, and reasonable inspection of the grandstands and bleachers located and being used at its playground—such an inspection as would have been commensurate with the hazards of injury to those lawfully using the stands and playground. If the City of Gulfport failed to make such inspection, or in the making failed to exercise reasonable care, and injury resulted from such failure, the City would be liable. Byrnes v. City of Jackson, supra; City of Jackson v. McFadden, supra; Augustine v. Town of Brant, 249 N.Y. 198, 163 N.E. 732; City of Sapulpa v. Young, 147 Okl. 179, 296 P. 418; Nation v. City of St. Joseph, Mo.App., 5 S.W.2d 1106.

■■ The familiar rule is that a verdict should not be directed at the conclusion of a trial unless the evidence so conclusively predominates on one side that reasonable men could not draw different conclusions from it. Trinidad Asphalt Mfg. Co. v. McIntosh, 5 Cir., 100 F.2d 310. No such condition obtained here. The evidence made issues which should have been submitted to the jury, and the court erred in directing a verdict for the defendant.

The judgment is reversed and the cause is remanded for proceedings in conformity with this opinion.

Reversed and remanded.

## On Petition for Rehearing.

PER CURIAM.

■ The petition for rehearing is overruled, but the jurisdictional issue is left open for decision in the first instance by the district court. While parties cannot consent to federal jurisdiction, they may agree to facts which sustain or defeat jurisdiction. The answer admits the diversity of citizenship between the parties and the requisite jurisdictional amount; but the pleadings may be amended in the court below so as to present the jurisdictional issue now raised in the petition for a rehearing, and the facts pertinent to that issue may then be developed.