Jimmy Ray WARNER, II, a minor, by and through his mother and next friend, Mrs. June Ruiz Wortmann, Plaintiff,

v.

The CITY OF BAY ST. LOUIS, a Municipal Corporation, Defendant.

Civ. A. No. 73S–232(N).

United States District Court, S. D. Mississippi, S. D.

Aug. 21, 1975.

John L. Hunter, Donald W. Cumbest, Pascagoula, Miss., for plaintiff.

Walter J. Phillips, Bay St. Louis, Miss., George E. Morse, Gulfport, Miss., for defendant.

## MEMORANDUM OPINION

NIXON, District Judge.

This diversity action was filed against the City of Bay St. Louis, Mississippi, a municipal corporation, seeking damages for serious and permanent personal injuries sustained by the then sixteen (16)

year old plaintiff as a result of his having dived off a pier or wharf alleged to have been owned and maintained by the defendant for public recreational purposes.

The plaintiff contends that on July 4, 1969, he was an invitee on the Municipal pier, never having been in that locality prior to that date; that the city maintained the pier for the benefit of the public who engaged in crabbing, fishing, swimming and diving therefrom; that the decking of the pier which was constructed on stringers supported by pilings driven into the bottom of the waters of the Bay of St. Louis, a navigable body of water, extended out approximately 700 feet to a height of approximately six (6) feet above the waters, which in the vicinity of the pier, varied in depth but was so shallow as to create a hazard for persons diving from the pier; that the city had not only constructive but actual knowledge of the danger to divers from the pier but failed to warn the public, including the plaintiff, through signs or otherwise, that the water was so shallow that diving constituted a dangerous and hazardous undertaking; and that on July 4, 1969, the minor plaintiff, visiting in the area of the pier for the first time dived therefrom into the waters of the Bay of St. Louis, a tributary of the Gulf of Mexico, and received severe, painful, permanent and disabling injuries to his cervical spine which have rendered him a quadriplegic.

The defendant contends that at the time the plaintiff was injured it did not own or maintain the pier as a municipal or public pier, and thus had no duty to the public including the plaintiff, to warn him of any danger existing in connection with diving therefrom or any use thereof; that the pier, which was being reconstructed by the Jaycees of the City of Bay St. Louis, had not been completed and was not open to public use; that the plaintiff assumed the risk of diving from the pier at a time when he knew the danger thereof, having already swum in an area some 100 to 200 feet closer to shore and dived from the pier in that area prior to the time that he made his ill-fated dive; and that the plaintiff was negligent in diving at a time when he did not know the depth of the water in the area where he dived and violated a city ordinance prohibiting diving from municipal piers and that his negligence was the sole proximate cause of his injuries.

This case was tried to the Court without a jury and based upon a preponderance of all of the evidence adduced and the law of the State of Mississippi which governs this diversity action, this Court makes the following Findings of Fact and reaches the following Conclusions of Law.

## FINDINGS OF FACT

In June and July, 1954 the City of Bay St. Louis, through its commission form of government, applied to the District Engineer of the United States Corps of Engineers in Mobile, Alabama for a permit to construct a public pier or wharf, approximately 1200 feet long and 8 feet wide with a perpendicular outer end 104 feet long by 18 feet wide in the Bay of St. Louis, at the foot of and as if a continuation of Ulman Avenue, a dedicated public street in the corporate limits of the City of Bay St. Louis, if extended out into the Gulf of Mexico. This permit was granted by the Corps on August 18, 1954 (Ex. P16), the pier was constructed by the City with the use of public funds (See Ex. P14) and was known as the Bay St. Louis Municipal Pier, having been completed sometime in 1956 and maintained by the Parks and Playgrounds Commission, a public commission of the defendant city, whose members were appointed by the mayor and two commissioners and who were responsible for creating and maintaining recreational facilities for the use of the general public within the city, including the Municipal Pier in question.

Subsequent to the completion of the building of this original pier, in the late 1950's or early 1960's it was substantially damaged by a hurricane or storm, but

was rebuilt or repaired by the City during late 1962 or early 1963. The reconstructed or repaired pier was maintained in the same manner and for the same purposes as was the original pier until it was again extensively damaged by Hurricane Betsy which struck in 1965. This hurricane tore all of the decking from the pier but left most of the foundation or pilings, some of which were leaning, and also a considerable amount of stringers, which were subsequently removed by the City for use on other city building or rebuilding projects.

This Court further finds, in accordance with the testimony of John A. Scafide, Sr., who was Mayor of the defendant city from 1953 until July 7, 1969, that the city did not abandon the idea of rebuilding or repairing the pier in question, at all times intending to rebuild it for the benefit of the public as soon as money became available therefor, and at no time abandoned, vacated, donated or in any other way divested itself of the ownership of the remaining parts of the pier while Mr. Scafide was Mayor. Mayor Scafide's testimony was corroborated by that of John Cyril Glover, who served as one of the two city commissioners for the defendant city from 1949 until July 7, 1969.

In early 1968, the local newspaper, the Sea Coast Echo, beginning with its March 14, 1968 issue, began advocating the rebuilding of the Municipal Pier which was pictured therein in its condition following Hurricane Betsy. As a result of this editorial, the Jaycees of Bay St. Louis formed a committee which was referred to in the March 21, 1968 issue of the Echo as the "MUNICIPAL PIER REBUILDING COMMITTEE", which was delegated the responsibility of rebuilding the pier. Members of this committee appeared before the Bay St. Louis City Council and requested permission to rebuild the pier, offering to donate or furnish cost-free labor and asking for financial assistance to obtain the necessary materials to complete the project. The City Council granted the Jaycees permission to proceed and in-

structed the Parks and Playgrounds Commission to provide $800.00, for which Warrant No. 322 of the defendant city was issued as shown in its Docket of Claims No. 2 dated February, 1969 (Ex. P13). In addition, the city gave the Jaycees some of the materials it had salvaged from the old pier and other city structures destroyed or damaged by Hurricane Betsy, and the Jaycees obtained financial assistance and materials from Hancock County, other civic clubs and through sponsored projects, at all times being supported by the Echo (Ex. P15). The repairs or rebuilding began early in 1969 and continued spasmodically, usually on week-ends, up until one or two months prior to July 4, 1969, when, because of the lack of necessary funds, the project was apparently discontinued or at least indefinitely suspended prior to its completion.

While the Jaycees were rebuilding the pier, they displayed a large sign on the shore near the entrance, denoting that the rebuilding was a Jaycee project. Although a smaller sign, approximately 16' × 24' was painted for them, the exact words of which the painter does not recall but which in effect cautioned that the pier was under construction, no witness was able to ever place this sign on the pier and the court finds that it was never posted or displayed thereon at any time during the construction project. However, while the Jaycees were physically present working on the pier they frequently told members of the public who came onto the pier to move off because they were interfering with the work going on, and after the completion of the work day, when they left the job, would place a small 2 × 4 barricade across the entrance to the pier, which they frequently found had been removed when they returned to resume work on the following weekends or evenings. There is no evidence that this barricade or any sign was present on the pier for a period of one month prior to July 4, 1969, and therefore, this Court finds that there was no barricade present at the entrance to this pier nor any sign thereon prohibiting the public from using the

pier or cautioning them in any way in connection with the use thereof, including any sign warning of shallow water or prohibiting the use of the pier for diving, swimming or any other purpose, despite the fact that the city had maintained a sign at this entrance to this pier denoting it as Municipal Pier and also signs thereon warning of shallow water and prohibiting diving, etc. On July 4, 1969, approximately 800 feet of the original 1000 feet of the decking had been replaced but the railings had not been reinstalled or rebuilt. The repair project had either been abandoned or indefinitely suspended because of the lack of funds.

The city was aware of the shallow water and the danger of diving, which is evidenced by the fact that it did maintain the above signs on this Municipal Pier prior to Hurricane Betsy. Furthermore, in 1965, prior to Betsy, another person, while diving from the pier, was injured as a result of his head striking bottom in shallow water, and this fact was admittedly brought to the attention of the city's mayor and chief executive officer, John Scafide, Sr.

On July 3, 1969, the then minor sixteen (16) year old plaintiff, Jimmy Ray Warner II, left his home in New Orleans, Louisiana and arrived in Bay St. Louis, Mississippi to spend the 4th of July holidays with his girl friend, her parents and grandparents. On July 4, he came to the area of this pier with his girl friend and her younger 12 year old brother. After fishing from a boat in the Bay of St. Louis in the general area where the pier was located until about 11 a. m. on the morning of the 4th, they rested, ate lunch and then decided to go swimming on what they considered to be the Bay St. Louis Municipal Pier, entering upon the pier at approximately 2 or 3 p. m. on a clear, sunny day. They walked down to the pier landing which was approximately 600 feet from shore and began to swim. The plaintiff, his girl friend and her brother dived off the pier a couple of times without incident and then the plaintiff and the young 12 year old walked out on the pier decking approximately 100 to 200 feet farther from shore. This time the 12 year old dived therefrom without incident or injury and the plaintiff dived in the same area immediately afterward, striking his head on the bottom of the Bay which resulted in blood flowing from his mouth and his left arm floating in front of his face, with inability to move it. He then blacked out or lost consciousness, regaining it on the pier while being given mouth to mouth resuscitation. This was the plaintiff's first visit to this area, although he had spent some short periods of time with his Mother on the front beach of the Gulf of Mexico in the area of Long Beach, Mississippi some several years before. At the time he and his companions entered upon the pier they saw other members of the public thereon utilizing and enjoying the pier, crabbing and swimming in the area.

Jimmy was taken by ambulance to Hancock General Hospital, and after being examined by a doctor, was not removed from the ambulance but was immediately taken to Memorial Hospital in Gulfport because of the severity of his injuries, which consisted of a fracture and dislocation of the fifth cervical vertebra, causing damage to the spinal cord, resulting in total paralysis from his chest down as well as the inability to use his arms, particularly his right arm, and loss of control of his bladder and bowels.

At Memorial Hospital a neurosurgical operation was performed, consisting of a posterior cervical fusion and decompression. The plaintiff remained hospitalized at Memorial from July 4 to August 19, 1969, and was then taken to Oschner Foundation Hospital in New Orleans where, because of the unsuccessful operation at Memorial, he underwent another operative procedure by Dr. Homer Kirgis, a neurosurgeon, which consisted of a decompression of the spinal cord, removal of the fifth cervical vertebra and an anterior intrabody fusion at C–4, C–5 and C–6. During his hospitalization at Oschner he was also operated on by an orthopedist who did a tendon transfer

from the brachial radialis to the extensor carpi to help improve the use of his hand which was virtually useless because of extreme weakness of his fingers. Jimmy remained hospitalized at Oschner from August 20, 1969 until November 6, 1969 when he was sent to Charity Hospital of New Orleans for further rehabilitation therapy. (See Ex. P18, Depos. Dr. Kirgis.)

Jimmy Warner was hospitalized at Charity for 146 days, being discharged on April 1, 1970. While there, he underwent physical therapy twice a day, school once a day and occupational therapy each day. At that time the diagnosis of his injuries was (1) quadriplegia, secondary to trauma and (2) decubitus ulcers of the heels and shoulders. During this period of time he had a persistent urinary tract infection, and upon being readmitted on May 18 he was in urinary retention and was septic. He was again committed to the LSU Urology Service at Charity the first part of June, 1970 and on June 4, he underwent an ileal loop operation consisting of the urethra being anastomosed to a loop of intestine and the urinary bladder bypassed. He was again discharged on June 23, 1970.

During the next two and one-half years he was re-admitted to Charity on four different occasions for persistent urinary infection and renal stones. A stone was removed from his right upper third ureter on October 25, 1972 and another removed from his left kidney on November 29, 1972. On June 28, 1973 another stone was removed from the right ureter as an emergency procedure. He is on continued urinary antibiotics and acidifying agents in an attempt to control his urinary infections, however, the possibility of eliminating the urinary infection is minimal. His ileal loop will be permanent and no further surgical procedures are planned in connection therewith. (Exs. P4, 5 and 6.)

The report of the Medical Director of Charity Hospital (Ex. P2) reflects that plaintiff's second admission after his initial 146 day hospitalization was on May 18, 1970, with discharge on June 23, 1970, as well as additional admissions from June 1 through June 4, 1972, October 24 until November 9, November 26 until December 23, 1972, May 7, 1973 until June 15, June 27 until September 14, 1973, and August 14 until September 10, 1974. Plaintiff underwent another operation in the early part of 1975.

As a result of his injuries sustained on July 4, 1969, Jimmy Warner is now a quadriplegic confined to bed, unable to care for himself and requiring 24 hour nursing service which is being rendered by his mother who is a nurse's aide, and his grandmother. A nurse's aide has been recently furnished by the Department of Welfare in New Orleans. Jimmy is completely paralyzed from the chest down with no sexual function or control of his bowels or bladder and with a tube and sac permanently implanted to permit him to urinate. In addition, he has practically no use whatsoever of his right arm and hand and very limited use of his left hand and arm. His only source of income is $146.00 per month, and it has been necessary for his mother to work in order to earn a living, inasmuch as his father, who is divorced from his mother, does not contribute to his support. Mrs. Wortmann has sold all of her furniture and clothes to help care for the plaintiff and when able to sleep, does so in a chair near his bed.

The plaintiff is permanently and totally disabled. Prior to his injury, he played football and was in extremely good health. He had dropped out of school after his freshman year in high school and was working as a common laborer for his father, a self employed contractor, and his average weekly wage was between $100.00 and $120.00 per week. His life expectancy at the time of his injury was 54.03 years.

The plaintiff is permitted to sit up only a limited period of time each day, experiences severe stomach cramps and muscle spasms, sweats profusely and frequently runs temperature associated with his constant and recurring urinary infections.

Medical bills incurred to date for the required treatment of his injuries consist of Memorial Hospital of Gulfport—charge of $4,082.57, (Ex. P–3), and an Oschner Foundation Hospital charge of $4,933.35 (Ex. P–8). Of course, all of the medical treatment rendered plaintiff at Charity Hospital was at no cost.

## CONCLUSIONS OF LAW

This Count finds that the defendant, City of Bay St. Louis, was the owner of, controlled, and had the duty to maintain this Municipal Pier in question on the date that the plaintiff was injured. The parties stipulated that the City owned the Pier prior to Hurricane Betsy in 1965 and ever since it was constructed by the City in 1954 pursuant to the permit issued in its favor by the Corps of Engineers. The evidence is undisputed that neither the defendant nor anyone else obtained a subsequent permit for reconstruction or rebuilding of this pier. None of the hurricanes in question completely destroyed the pier but simply damaged it badly, leaving its foundation or pilings, some of which were admittedly tilted, and a considerable amount of the stringers. The City itself, the Bay St. Louis Jaycees and the public recognized the fact that the City at no time intended to or did relinquish, abandon or convey this pier which was rebuilt each time in its original location and at least partially on its original pilings. The Jaycees applied and received permission from the City to repair or rebuild the pier as a civic project, and the defendant contributed some of the materials which had been removed from the Pier after Hurricane Betsy and made an $800.00 donation through its Parks and Playgrounds Commission for the purchase of materials by the Jaycees for repair of this pier. The City's Minutes do not reflect anything concerning the pier from the date of Hurricane Betsy through the date of July 4, 1969, other than the $800.00 voucher issued to the Jaycees. It is ludicrous to assume that the Bay St. Louis Jaycees in any way intended to, much less did acquire the ownership, control and corresponding duty of maintenance of this Municipal Pier which was constructed and repaired by the City of Bay St. Louis opposite Ulman Avenue. Additionally, all property owners on the West side of the beach road, which separates the end of Ulman Avenue from the sand beach, are assessed and pay taxes on their property located on the Bay or East side of the road, having granted easements to Hancock County subsequent to the pumping of sand East of the beach road. As previously noted, Ulman Avenue is a dedicated city street and the pier is located at the foot of Ulman Avenue as it is dedicated and officially platted to the Bay. It is established beyond a doubt that the City intended to rebuild or repair the pier as soon as possible for the use of the public after Hurricane Betsy, but was unable to do so because of a shortage of available funds and permitted the Jaycees to undertake repairs for and on its behalf.

In Mississippi a municipality cannot delegate its responsibility with respect to maintenance of public property to anyone, but is under a non-delegable duty to maintain public property, including public piers, in a reasonably safe condition. *Bush v. City of Laurel,* 215 So.2d 256 (Miss.1968); *City of Laurel v. Upton,* 253 Miss. 380, 175 So.2d 621 (1965); *Standard Oil v. Decell,* 175 Miss. 251, 166 So. 379 (1936); *Town of Senatobia v. Dean,* 157 Miss. 207, 127 So. 773 (1930); *Atkinson v. Town of Decatur,* 131 Miss. 707, 95 So. 689 (1923); *Harllee v. City of Gulfport,* 120 F.2d 41 (5th Cir. 1941). The foregoing cases teach that a city's duty to use due care in the maintenance of city property, including municipal piers, cannot be delegated, nor can it be relieved therefrom by surrender of possession or even of jurisdiction pursuant to statutory authority, a fact not even existent in the case sub judice. Therefore, the defendant, City of Bay St. Louis, which maintained this municipal pier in its proprietary capacity for purposes of recreation for its citizens and as a tourist attraction, had a duty to

382

warn invitees using the pier, including the minor plaintiff, that the water in the area was shallow and that it was dangerous to dive therein from its Municipal Pier, which dangerous condition not only should have been but was actually known by the City. *Dendy v. City of Pascagoula,* 193 So.2d 559 (Miss.1967). The City failed to discharge this duty, and its failure constituted negligence which proximately contributed to cause the plaintiff's painful, permanent and serious injuries, sufferings and damages which he sustained when he dived from this pier in the City of Bay St. Louis.

This Court finds that the plaintiff did not voluntarily assume a risk which he knew existed, and thus, the City's defense of Assumption of The Risk is without merit. However, this Court finds that the plaintiff's diving into the water under the circumstances, although he had dived twice previously closer to shore without injuring himself, constituted negligence on his part which proximately contributed 50% to cause his injuries. Therefore, under the Comparative Negligence Doctrine of the State of Mississippi the amount of damages or compensation to which he would otherwise be entitled to recover against the defendant must be reduced by 50%.

In the absence of his above contributory negligence, the plaintiff would be entitled to a judgment against the defendant in the sum and amount of $750,000.00, actual or compensatory damages, and thus he is entitled to a judgment against the defendant in the sum and amount of $375,000.00, together with all costs of this proceeding.

A judgment conforming with the foregoing Findings of Fact and Conclusions of Law, approved as to form by the attorneys for both sides shall be presented to this Court within five days at Biloxi, Mississippi.