STANDARD OIL CO., INC., *et al. v.* DECELL.

(In Banc. Mar. 9, 1936. Suggestion of Error Overruled, April 13, 1936.)

[166 So. 379. No. 31947.]

G. Garland Lyell, of Jackson, and J. H. Garth, of Hazlehurst, for appellants.

254

**Myron S. McNeil,** of Hazlehurst, and **J. M. Stevens, Jr.,** of Jackson, for appellee.

Argued orally by **G. Garland Lyell,** for appellant, and by **J. M. Stevens, Jr.,** for appellee.

**Anderson, J.,** delivered the opinion of the court.

Appellee brought this action in the circuit court of Copiah county against appellants, the Standard Oil Company of Kentucky, a nonresident corporation, and the city of Hazlehurst in Copiah county, and Geo. W. Harrison, a resident citizen of that county, to recover damages for a personal injury sustained by her at what is commonly known as an automobile service station, situated in said city. The land on which it was located was owned by the city, and leased to the Standard Oil Company for the erection and maintenance by it of such service station, and by that company subleased to Harrison. The ground of liability was that appellant negligently maintained at the service station, near a public walkway, a grease pit, into which appellee fell and was injured. There was a verdict and judgment in the sum of three thousand seven hundred fifty dollars, from which appellants, the Standard Oil Company and the city of Hazlehurst, prosecute this appeal.

The Standard Oil Company contends that the circuit court was without jurisdiction because the case had been removed into the Federal District Court for the Southern District of this state, before the conclusion of the trial in the circuit court. That contention is based upon the following facts, which transpired during the trial in the circuit court: In giving a history of what occurred we deem it unnecessary to undertake to give a definition of the term "nonsuit" and some of the other language used. We go directly to the substance, and leave out the forms.

Appellee was upon the witness stand, testifying in her own behalf. On cross-examination she was asked by appellant's counsel if she knew that she was suing the city of Hazlehurst in which she resided, and her friend, Geo. W. Harrison, for a large sum of money. She answered that she did not, and did not want any money

from them. Further on, however, she stated that she was willing to abide by the action of her counsel, Mr. McNeil, in that respect. Thereupon appellants moved the court to dismiss the suit. This motion was joined in by the appellee, so far as the city of Hazlehurst and Harrison were concerned. Before it was acted on by the court, however, the Standard Oil Company gave notice of its purpose to remove the case to the federal court upon the ground of diversity of citizenship, the amount involved being sufficient under the removal statute, and that the necessary petition and bond for removal would be immediately prepared and presented to the court. The appellee thereupon moved the court to overrule the motion so far as the city of Hazlehurst was concerned. Thus far these proceedings took place about twelve-thirty in the afternoon. Something like half an hour afterwards the Standard Oil Company presented to the court a petition and bond in due form for removal of the cause to the Federal District Court. It was then that the court overruled the motion to dismiss, and refused to enter an order removing the cause to the federal court. In other words, when the application for removal was presented to the court, there were still before it all of the defendants.

The giving of the notice of the purpose to apply to the court to remove the cause was not sufficient to effect that result. The status of the case at the particular time the application for removal is made controls. The state court had the right to pass on the sufficiency of the petition and bond for removal. It could not be deprived of jurisdiction unless they were sufficient under the law. The giving of notice of intention to remove is only for the purpose of giving the court and parties to the suit an opportunity to examine the sufficiency of the petition and bond, and does not operate as a transfer of jurisdiction from the state court to the federal court. Title 28 U. S. C. A., sec. 72, notes 302, 325, 326, and 371. Even

if the court had entered an order dismissing the cause as to the resident defendants, and had set it aside before the petition and bond for removal had been presented, the result would be the same. The application for removal would come too late.

The refusal of the court to direct a verdict in favor of appellants is assigned and argued as error. The consideration of this question necessitates a history of the case.

The courthouse square in the city of Hazlehurst is bounded on the south by Downing street, on the west by Lowe, and on the north by Gallatin streets. The last-named street, therefore, runs east and west, Lowe north and south, and Downing east and west. In the northwest corner of the courthouse square, and therefore at the intersection of Gallatin and Lowe streets, the city of Hazlehurst owns, and has owned for many years, a lot forty feet east and west by fifty feet north and south. In 1923 the city leased this lot to the Standard Oil Company of Kentucky for a period of five years. The lease had been renewed for another period of five years, and covered the period of appellee's injuries. It provided that the Standard Oil Company should construct and operate on the premises an automobile service station for the sale of its products to its consumers; that its business should be conducted in compliance with the ordinances of the city and the laws of the state, and in such a manner as not to impose liability on the city; and that the Standard Oil Company "shall have the right and privilege of using the said property, sidewalks, parkways, street frontage, etc., to the extent and in the manner ordinary in leases of this nature." The Standard Oil Company erected on the lot the usual automobile service station, facing northwest; its front, therefore, was the right angle triangle made by the intersection of Gallatin street running east and west, and Lowe street running north and south. It consists of a brick building

and drive-under shed in front, with tanks, grease pit, and other equipment. Its side walls and roof, of course, run approximately northwest and southeast, and its rear wall runs northeast and southwest. Constructed on the southwest side of the building, and parallel with it, is what is known as a ''grease pit,'' used in greasing automobiles. It is approximately ten feet in length, four feet deep, and three feet wide, with a concrete curb from four to six inches high. Lowe street on the west is paved, but with no sidewalks. In going to the business part of the city of Hazlehurst, a large proportion of the people go north on Lowe street, thence into Gallatin, and west. Beginning soon after the construction and operation of the service station, and continuously since, instead of going to the intersection of Lowe and Gallatin streets, they cut across the triangle under the shed of the service station, thereby materially shortening the distance. In fact, this way had become a thoroughfare, to the knowledge of the city and the Standard Oil Company, its lessee, and to Harrison, the sublessee. Soon after the station was constructed by the Standard Oil Company, it furnished its lessee a cover for the grease pit, with instructions always to cover it at night to keep any one from falling in and being injured. This cover was used for several years, but had not been in use for two or three years before appellee was injured. Appellee was injured on the seventeenth of October, 1934. In 1933 the lease between the city and the Standard Oil Company had been renewed for another five-year term. At that time the grease pit cover was not in use, and had not been for some time—the cover had been discarded and removed from the premises. The station was always closed at night with the lights off. The Standard Oil Company and the city both knew of this when the lease was renewed, or with any sort of reasonable care should have known of it. For some years before the injury was sustained by appellee the service station had been sub-

leased to Harrison. He knew, of course, that the grease pit cover had been discarded, and the resulting danger to pedestrians. There was a street light at the intersection of Gallatin and Lowe streets, seventy feet away; but the evidence tended to show that it insufficiently lighted the front of the station, and especially the grease pit on the southwest side. Appellee was injured about seven-thirty o'clock at night. The service station was unlighted. Appellee and her daughter, Mrs. Clower, were going to see a sick friend on Gallatin street, and walked up Lowe street north, to the service station, and there took the usual course of pedestrians, and started to cut across to Gallatin. The evidence showed that the northwest end of the grease pit was within one foot of the usual traveled way of pedestrians. As appellee and her daughter entered the front of the station, Harrison, his wife, and a lady guest in Harrison's automobile, returning from Jackson, going west on Gallatin street, swung out of that street under the shed in front of the station, facing southwest; their purpose was to stop at the station and get some milk out of the icebox for the Harrison baby. As the car entered the driveway under the shed, appellee and her daughter were passing the grease pit on their right. The glare of the lights from the car in their faces startled them, and fearing that the car would not stop, Mrs. Clower jumped to the left to get out of its way, and appellee to the right; and in jumping to the right one of her feet struck the curb to the grease pit, causing her to fall therein; by the fall her left wrist was broken in two places and dislocated.

Appellee lived just across the street from the service station, and was thoroughly familiar with the grease pit and its location. She testified that the sudden appearance of the car, the glare of its lights in her face, and the fear of being struck and run over by it, caused her to momentarily forget the existence of the pit when she jumped to the right. The evidence showed that the two breaks

in her wrist and the dislocation were permanent injuries—the wrist and fingers of her hand are entirely useless.

Harrison's lease from the Standard Oil Company had been renewed for another year two days before the injury. It will be observed, from what has been stated, that if there had been a sidewalk on the east side of Lowe street, its entire width would have been occupied by the service station. In other words, the service station was in part located in the street.

We will consider first the question as to the liability of the city. Municipalities are required to use reasonable care to keep their streets, sidewalks, and other thoroughfares in reasonably safe condition for persons exercising reasonable care and caution. City of Greenville v. Laury, 172 Miss. 118, 159 So. 121. An obstruction was erected in one of the streets of Greenville; it was a water tank, which caused an injury to one Nesbitt, who sued the city. The court held the city liable if the obstruction continued after knowledge of its existence. Nesbitt v. Greenville, 69 Miss. 22, 10 So. 452, 30 Am. St. Rep. 521.

Where a municipality, in grading a street near a school leaves a high bluff—dangerous because of a tendency to cave—and one of the children attending the school, passing near the bluff, is killed by the caving street, the city is liable. City of Vicksburg v. McLain, 67 Miss. 4, 6 So. 774. To the same effect are Mackey v. Vicksburg, 64 Miss. 777, 2 So. 178; Jordan v. Lexington, 133 Miss. 440, 97 So. 758; McComb City v. Hayman, 124 Miss. 525, 87 So. 11; City of Vicksburg v. Scott, 168 Miss. 572, 151 So. 914. Here we have a much-traveled way for pedestrians, over property belonging to the city. It had been used as a public way for years; the city knew it. Near it, unlighted and without a cover, was this grease pit—under those circumstances a dangerous thing. It was incumbent on the city to take the necessary steps to do away with this danger, or to require the lessee, the Standard Oil Company, to do so.

It is argued that the Standard Oil Company is not liable because it had subleased the premises to Harrison, whose duty it was to take the necessary steps to obviate the danger of the grease pit.

The evidence shows without conflict that the Standard Oil Company knew that the uncovered and unlighted grease pit was a dangerous instrumentality. As above stated, it furnished for some years a cover for the pit, with instructions to its lessee always to keep it covered at night. The cover it furnished had become useless and was thrown aside. It failed to furnish its lessee with another cover. It renewed the lease with the city for another five-year term, knowing that the cover was out of use—knowing of the danger. Two days before the injury the Standard Oil Company had renewed its lease with Harrison for another year, knowing of the danger. The rule is that where the lessor relies upon the condition of the premises at the time, there is no difference between an original contract of lease and the renewal of an existing lease. Whatever the condition of the premises at the time they were originally let, if when the lease was renewed the dangerous condition existed, the renewal is deemed an authorization by the lessor of its continuance. 16 R. C. L. 1079, sec. 596.

A possessor of land who creates or maintains thereon an excavation or other artificial condition so near an existing highway that he realizes, or should realize, that it involves an unreasonable risk to others accidentally brought into contact therewith while traveling upon the highway, is subject to liability for bodily harm thereby caused to them. A. L. I. Rest. Torts, sec. 368.

The lessor who leases land for a purpose which involves the admission of a large number of persons as patrons of his lessee is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor knew, or should have known, of the condition, and realized or

should have realized the unreasonable risk to them involved, and if he had reason to expect that the lessee would admit his patrons before the land was put in reasonably safe condition for their reception. A. L. I. Rest. Torts, sec. 359.

We can see no reason why exactly the same principle should not apply where a large number of persons, although not patrons of the lessee to the knowledge of the lessor, used the premises as a passageway for pedestrians. The Standard Oil Company, Harrison's lessor, knew of the danger of the pit, and knew that at night it was left unclosed and unlighted, except for the dim and insufficient light of the street lamp; and knew, or should have known, that Harrison was going to continue the business without remedying the danger.

We think, therefore, that it was a question for the jury, under the evidence, whether both the city and the Standard Oil Company were liable.

Appellant complains of the action of the court in giving certain instructions submitting to the jury the doctrine of momentary forgetfulness. By these instructions the jury were told, in substance, that if they believed from a preponderance of the evidence that the passageway through the service station was used by the public generally, with the full knowledge and consent of the Standard Oil Company and the city, that it then became their duty to maintain the passageway in a reasonably safe condition, and that if the jury believed from a preponderance of the evidence in the case that reasonable care would have required them to place a cover over the grease pit, and that they failed to do so, and that their failure was the proximate cause of appellee's injury, and if they further believed from a preponderance of the evidence that appellee, while traveling along the way, was exercising reasonable care for her own safety, ''and was suddenly confused, blinded and frightened by an approaching automobile, stepped aside

and momentarily forgot the existence of the pit," and fell into it and was injured, then she was entitled to a verdict.

The argument is that by these instructions the court took away from the jury the consideration of contributory negligence on the part of appellee. We think this contention is without merit. Where a person has exercised the care and caution which an ordinarily prudent person would have exercised under the same or similar circumstances, he is not negligent merely because he temporarily forgot or was inattentive to a known danger. Momentary forgetfulness is not negligence unless it amounts under the circumstances to a failure to exercise ordinary care for one's safety. Regard must be had for the exigencies of the situation—the circumstances of the particular case. Circumstances may exist under which forgetfulness or inattention to a known danger may be entirely consistent with the exercise of ordinary care, as where the situation requires one to give undivided attention to other matters, or is such as to produce hurry or confusion, or where conditions arise suddenly which are calculated to divert one's attention momentarily from the danger. 45 C. J. 950, sec. 509.

The refusal of appellant's instruction 14 is assigned and argued as error. By that instruction appellant sought to have the court inform the jury that if the evidence showed that appellee failed or refused to comply with the instructions of her physician who set her arm and treated her fingers and hand, and as a result of such failure to comply, her arm and fingers were made stiffer or less useful, then she alone was responsible for the additional uselessness, and could not recover any damages for such increased infirmity. We think the instruction was properly refused under the evidence. Appellee's physician testified that he instructed the appellee to flex her fingers, and that he tried to do it for her, but that it was so painful that she would not permit it.

He said that flexing the fingers was the proper treatment; but he could not say that if she had carried out the instructions it would have helped her hand and fingers—he was not at all certain about that. Of course, it was the duty of appellee to reduce her damages if she could; but there is no certainty, from the evidence, that she could have done so—in fact, the evidence does not tend to prove that she could have done so.

What we have said as to the liability of the city and the Standard Oil Company disposes of appellant's objections to other instructions given appellee, and also the other instructions refused appellant.

What has been said so far is concurred in by Justices McGowen, Cook, Etheridge, and the writer, and results in the affirmance of the case. What follows are my views alone, and is therefore a dissent. I think the judgment ought to be reversed solely on the ground of improper argument on the part of appellee's counsel. In his argument he stated to the jury, in substance, that he had stood for the payment of appellee's doctor's and hospital bills because she was not able to pay them; that he had gone on her note to borrow money with which to pay the taxes on her property, which had been advertised for sale for the city taxes thereon; that the Mellons and the John D. Rockefellers had gobbled up the city streets of Hazlehurst and elsewhere, that belonged to the people; that the city of Hazlehurst had leased part of its streets to the Standard Oil Company in disregard of the rights of the people of the city. Appellant objected to this argument. The court sustained the objection, and admonished the jury to disregard it. Appellant then asked that a mistrial be entered on account of the argument. This request was denied by the court. One of appellant's counsel had mentioned the fact that appellee was carried to the hospital at Jackson by appellee's counsel, and that whatever judgment might be rendered would have to be paid by "poor old

Harrison," the lessee of the station under the Standard Oil Company; that the people of Hazlehurst ought to feel grateful to the defendants for permitting them to go through the station without objection. Appellee contends that this argument by appellant's counsel provoked the argument by her counsel which was objected to. What occurred in this respect was embodied in a special bill of exceptions, signed by the judge and made a part of the record.

Such argument, in my opinion, was calculated to highly inflame and prejudice the jury, especially against the Standard Oil Company, and was so harmful that its prejudicial effect could not be obviated by the admonition of the court to the jury to disregard it—it was incurable. Its tendency could have been nothing less than persuasive on the jury to find a verdict for appellee both on the issue of liability, which was a controverted issue, and also for an increased amount of damages.

This dissent, in my opinion, is amply supported by the following cases: Brush v. Lourendine. 168 Miss. 7, 150 So. 818; Morrell Packing Co. v. Branning, 155 Miss. 376, 124 So. 356; Pickwick Greyhound Lines v. Silver, 155 Miss. 765, 125 So. 340; White's Market & Grocery Co. v. John, 153 Miss. 860, 866, 121 So. 825; Morse v. Phillips, 157 Miss. 452, 128 So. 336; N. O. & N. E. R. Co. v. Jackson, 140 Miss. 375, 105 So. 770.

In F. W. Woolworth Co. v. Wilson (C. C. A.), 74 F. (2d) 439, 443, 98 A. L. R. 681, the court used this language: "Sympathy for suffering and indignation at wrong are worthy sentiments, but they are not safe visitors in the courtroom, for they may blind the eyes of Justice. They may not enter the jury box, nor be heard on the witness stand, nor speak too loudly through the voice of counsel. In judicial inquiry the cold clear truth is to be sought and dispassionately analyzed under the colorless lenses of the law."

**Griffith, J.,** delivered a dissenting opinion.

In City of Greenville v. Laury, 172 Miss. 118, 159 So. 121, 123, there was a hole in the street which caused the injury and was amply sufficient to do so, as the facts demonstrated. The court in banc held, however, that the city was entitled to a peremptory instruction, because the injured person could have seen and avoided the defective place in the street had she used due care in the use of the street. There the injury was in the daytime, and all that the appellee had to do was to look where she was going. So in this case, if the injury had occurred in the daytime, there would certainly be no just cause for a claim of liability, because the grease pit was perfectly plainly to be seen, and, moreover, was not in the thoroughfare at all but was entirely outside thereof, and could only be fallen into by turning aside from the thoroughfare—in other words, by going out of the way.

The grease pit in this case was a necessary or proper adjunct or instrumentality in the conduct of the business of the service station. The station had a right to have it. In order to use it, the top of it had to be open. It was built in such a manner as to make it reasonably convenient to the business for which it was designed and at the same time was placed outside of the course of travel along the thoroughfare adjacent thereto, and in such a position, as we have already said, that any person passing along there in the daytime, and who was in the exercise of any sort of due care, could not fail to have seen it, and to get in it would have had to turn aside and go out of the way; and especially is this true as respects appellee here, who knew of the exact location of the grease pit and had known of it for years.

The grease pit would, therefore, be or become a danger, as would be so recognized in the law of negligence, only during the nighttime, which is to say, when not lighted in such a way as to be practically as well seen

as in the daytime. The lessor, the oil company, had furnished all the equipment and facilities for lighting the premises and, so far as the record shows, the lighting facilities, when turned into use, made the premises substantially as clear as day. But it was no part of the duty of the lessor, the landlord, to stand by and see that the tenant kept the lights burning. The landlord having furnished all the necessary facilities for adequate lights, the failure to use them was solely the negligence of the tenant Harrison, who was not sued. It would be an unreasonable and an intolerable requirement that a landlord shall stand guard over his tenant and see that he uses the equipment furnished, and there is no such requirement in our law, or in the law anywhere. See the numerous cases collected in 44 L. R. A. at page 284.

Or the grease pit could have been covered at night when not in use. The evidence shows that an adequate cover could have been availed of for a trifling cost—two or three short planks, cleated together, would have been sufficient. If the tenant, in order to save the cost of electric current, elected to turn out the lights at night, elected not to use the lighting facilities furnished him to avoid the danger of the grease pit and which, as we have already said, would have avoided it in that measure of care which would have satisfied the law, then in so electing the tenant was under duty to furnish a cover for the grease pit at night and to use the same, and his failure to do so was his negligence and his alone, for the reason that when the landlord has furnished certain instrumentalities which render the rented premises reasonably safe, the tenant must either use these instrumentalities, or he must himself furnish and use the necessary substitute therefor, and his failure to do one or the other, or both, is not chargeable under the law to the landlord.

We have said that had the premises been kept adequately lighted—the failure to do which was the sole

negligence of the tenant—then that measure of care which would have satisfied the law would have been fulfilled. We prove this statement by another one of the latest cases in our books, precisely in point, namely, Louisiana Oil Corp. v. Davis, 172 Miss. 126, 158 So. 792, which was a case where the alleged danger which caused the injury was inside of the used pathway, in the path of travel itself, under the shed of the oil service station, a more probable danger than here, and the court held that had the way been lighted, the appellant would have been entitled to a peremptory instruction. So here, if the premises had been thoroughly lighted, there would be no liability; and since that duty to keep the lights burning was a duty solely of the tenant, the tenant only is liable here, and not the appellant lessors. The peremptory instruction requested by the lessors should have been granted.

But in order to arrive at liability against the oil company and the city, the majority have veered away from both the two cases above cited, although they are the latest cases in our reports on the subject. The court in banc in the Laury case went most thoroughly into the governing principles in such cases, and it was hoped that what was said there would be regarded as settled, at least for some little time to come. It was there laid down as the governing principles in such cases that a municipality owes to one of the general public "the duty to exercise ordinary care to keep its streets reasonably safe for use by persons *exercising reasonable care and caution;*" and the court quoted with approval the language in the Woodham case (Cumberland Telephone & Telegraph Co. v. Woodham), 99 Miss. 318, 54 So. 890, a leading case in our books, that " 'the negligent act of a person, resulting in injury, . . . creates liability therefor, when the act is of such character that, *by the usual course of events,* some injury, not necessarily the particular injury, or injury received in the particular

manner complained of, would result therefrom, provided the attendant circumstances are such that an ordinarily prudent man ought reasonably to have anticipated that some injury *would probably result* from the act done.' . . . It will not be sufficient to say that injury to such a person *was possible,* . . . injury to some one . . . must have been so *probable* that a reasonably prudent man should have anticipated *that probability.*" The test is summed up in the Laury case in this language: Was the alleged defect or danger in the street "of such character as to make the street unsafe for use by persons in the exercise of reasonable care, and that an ordinarily prudent person ought reasonably to have anticipated that some injury *would probably result therefrom to a person when using the street and exercising reasonable care and caution in so doing.*" (Italics supplied.) Such is the test in respect to the proximate cause in such cases. And as already pointed out, the test of reasonable anticipation is a measurement according to the usual course of events, whether according to the usual experience of mankind it should have been reasonably foreseen as probable, not as respects a rarely extraordinary or accidental experience, but something within the reasonable range of usual experiences, according to the natural course of things; for the reasonable range of the usual course of things is within the field of probabilities, while distinctly unusual and extraordinary events belong to the field of possibilities, and to that field only.

But the main opinion in the present case departs from the above-quoted principles in the Laury case, and now goes further and holds that the municipality must anticipate distinctly unusual or extraordinary events, and is liable if it fails to so construct or maintain its thoroughfares as to guard against such distinctly unusual or extraordinary events; in other words, it is liable for possibilities, as well as probabilities. And this is

true because the majority proceeds at some length to speak of the fact that the appellee had become frightened at the sudden and unexpected approach of an automobile —under extremely unusual circumstances as the record shows without dispute—and appellee, in a moment of forgetfulness, had fallen into the grease pit, the location of which was well known to her and had been for a long time, and which the facts show presented no appreciable danger to her had she been in the exercise of due care *in the usual course of events.* The danger arose only when she became frightened and momentarily forgot, and this was the result of a distinctly unusual or extraordinary event, was a possibility only, and falls outside of the field of probabilities according to the usual and natural course of events.

Instruction No. 1, granted at the request of appellee, reads as follows: "Even if the jury should believe from the evidence in this case that the street lights were such that the plaintiff could see the pit where the accident occurred, yet this would not prevent her recovery, if the jury further believe from a preponderance of the evidence that the front of the filling station and the approaches thereto were constantly used by the public generally in going to and from the main part of the city of Hazlehurst for a long period of time, and that this use by the public was known to the defendant, and that the grease pit described was constructed and maintained in such relation to the public street and in such proximity to the traveled way that the defendants could reasonably have foreseen that a person traveling on said way, in the exercise of due care for himself, would be injured, and the plaintiff, while traveling along said way, in the exercise of due care, and while walking through the filling station over said used way was suddenly confronted and blinded by an approaching automobile and was frightened by its sudden appearance, and it reasonably appeared to the plaintiff, situated as she was,

that she might be struck by said automobile and that she stepped aside to avoid a collision with the automobile and momentarily forgot the existence of the pit and fell into the same and was injured, then it is the sworn duty of the jury to find a verdict for the plaintiff."

It will be seen that this instruction opens by granting that the way was sufficiently lighted, but proceeds thereupon to place before the jury that what must be foreseen by the city was an event of fright and momentary forgetfulness—a distinctly unusual or extraordinary event, an invitation into the field of possibilities. And the instruction could hardly have been otherwise understood by a jury of average men unlearned in the law. It was intended to be so understood, as an analysis of the argument made in appellee's briefs will disclose; and it is well settled in our decisions that an instruction so framed as to mislead a jury upon an important phase of the case is as much a reversible error as is an instruction which erroneously misdirects the jury in the plainest terms.

All that fright or momentary forgetfulness has to do with such cases is to relieve the person injured, that is to say, the plaintiff, of the charge of contributory negligence. The citation of the majority dealing with this point, 45 C. J., pp. 950, 951, is found under the general head Contributory Negligence, Id., p. 940, and so it will be found in all the books. But what has been done here is to take a doctrine which operates solely to the relief of contributory negligence, which is a secondary question, and carry it over into the field of the primary inquiry whether the defendants have on their part been guilty of actionable negligence, that is to say, of negligence, which was the proximate cause of the injury, as to which the matter of contributory negligence has nothing to do, and by the said instructions as drawn, to place the situation before the jury in such a sequence of a connected course of language as to cause

them, as we have already said, to conclude that the law is that municipalities must anticipate and guard against such distinctly unusual and extraordinary circumstances as fright and the like; in other words, they must guard against possibilities as well as probabilities.

If municipalities must, under the penalty of liability for such possible injuries, so construct and maintain their streets as to guard against all such possibilities of fright or forgetfulness, then there are hundreds of such places in every municipality of the state, and thousands of them in the larger towns and cities, and which to eliminate and to keep them eliminated would bankrupt the municipalities and keep them bankrupt. Municipalities are not required to construct or maintain their streets and thoroughfares so as to be safe to the blind, nor to those who having eyes do not see, and it is immaterial what it may be that caused them not to see, so long as that cause was something done, or omitted to be done, by some other person or agency than the municipality. The principle of decision upon which the majority has proceeded is not only unsound, as I submit with deference, and particularly as regards the quoted instruction, but would if followed carry liability to an unbearable length. It involves a confusion of legal concepts, will confuse the bar and the trial bench, and is bound to return to plague this court.

**Smith, C. J.,** concurs in this dissent.

**Smith, C. J.,** delivered a dissenting opinion.

I concur in what my brother GRIFFITH has herein said, and in support of the appellant's right to a directed verdict will say further: The land on which the appellee was injured was no part of the city's streets. It was owned by the city, but was devoted by it to a private use. Its liability vel non for the appellee's injury, there-

fore, is that only which arises because it owned the land. Having leased it to the Standard Oil Company, and the Standard Oil Company having leased it to Harrison, the liability of the city and the Standard Oil Company is that only which attaches to a lessor of land.

This liability is accurately set forth in 1 Rest. Torts, secs. 356 to 362, inclusive:

"Sec. 356. Except as stated in sections 357 to 362, a lessor of land is not liable for bodily harm caused to his lessee or others upon the land with the consent of the lessee or a sub-lessee by any dangerous condition whether natural or artificial which existed when the lessee took possession."

The only section of the restatement referred to in section 356 thereof that has any bearing hereon is section 359, which is as follows:

"A lessor who leases land for a purpose which involves the admission of a large number of persons as patrons of his lessee, is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor (a) knew or should have known of the condition and realized or should have realized the unreasonable risk to them involved therein, and (b) had reason to expect that the lessee would admit his patrons before the land was put in reasonably safe condition for their reception."

"The word 'patron' denotes a licensee invited or permitted to enter the land for the purpose for which the land is leased." Comment A on this section. The appellee is not this character of a licensee. She was upon the land for purposes of her own, wholly disconnected from the business of the tenant, and therefore at the time was a mere gratuitous licensee. 1 Rest. Torts, sec. 331. But even if a gratuitous licensee be held to be within the rule of this section, nevertheless, the appellants are not liable for the appellee's injuries. The existence of the oil pit was not only obvious, but was known to

Harrison when he leased the land, and was necessary for the purposes of the business he intended to conduct thereon. It constituted no hazard to persons in its vicinity who were using the premises for the business for which it was leased, for this would be either in the daytime or when the station was lighted. Any duty to persons permitted to use the premises for purposes other than those for which the lessors made the lease rested solely upon the person in possession of the premises as lessee, and who had the sole authority to so permit or to refuse the permission, to-wit, Harrison. The appellant lessors were under no duty to supervise the use of the premises by Harrison, and had no authority to enter upon the premises for that purpose, consequently they are not responsible in law for his leaving the premises unlighted, or in the alternative for his leaving the grease pit uncovered. 16 R. C. L. 1070, 1071, notes in 50 L. R. A. (N. S.) 286, and 92 Am. St. Rep. 519.

There is another reason why no recovery should be here permitted. As hereinbefore stated, the land on which this filling station was situated was no part of the city's streets, but was used by it wholly for private purposes. In order to avoid making the angle of the street corner, the appellee, as she and others had been accustomed to do, crossed the land from one street to the other. The case is therefore strikingly similar to Illinois Central R. Co. v. Arnola, 78 Miss. 787, 29 So. 768, 84 Am. St. Rep. 645, wherein the court said that the appellee, the plaintiff ''was a mere licensee, and the appellant owed her no duty except that of not inflicting upon her a willful or wanton wrong. . . . A person who, without the invitation or inducement of the owner, goes upon the land or premises of such owner, takes such permission with all the dangers attending it.'' The leaving of this pit uncovered cannot be here said to have been a willful and wanton wrong, for the appellee knew of the existence of the pit and the manner of its use.

1 Rest. Torts, sec. 341, and comments thereon. The Arnola case is in accord with the rule in other jurisdictions. See particularly Fox v. Warren-Quinlan Asphalt Co., 204 N. Y. 240, 97 N. E. 497, 38 L. R. A. (N. S.) 395, Ann. Cas. 1913C, 745; Habina v. Twin City General Elec. Co., 150 Mich. 41, 113 N. W. 586, 13 L. R. A. (N. S.) 1126; and Branan v. Wimsatt, 54 App. D. C. 374, 298 F. 833, 835, 36 A. L. R. 14; 20 R. C. L. 59, note 3, p. 60, and 7 R. C. L. Supp. 4817; 2 Cooley on Torts (3 Ed.) 1268.

**Griffith, J.,** concurs in the foregoing dissent.