604 F.2d 950
 5 Fed. R. Evid. Serv. 504
 Susie Mae JOHNSON, Plaintiff-Appellant Cross-Appellee,
v.
WILLIAM C. ELLIS & SONS IRON WORKS, INC., etc., Defendant-Appellee.
Long Reach Manufacturing, a Division of Anderson, Clayton &
Co., Defendant-Appellee Cross-Appellant.
 No. 77-1919.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 18, 1979.
 
 Robert Lawson Holladay, P. J. Townsend, Jr., Drew, Miss., for Johnson.
 W. O. Luckett, Jr., Clarksdale, Miss., for Ellis.
 W. Swan Yerger, Robert T. Gordon, Jr., Jackson, Miss., for Long Reach.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before TUTTLE, GODBOLD and RUBIN, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 Jack Johnson died at the age of 20 as a result of injuries received while he was working on a cotton compress. His mother seeks in this diversity action to recover damages for his death from the company that had repaired and rebuilt the compress thirteen years before, and from the company that had later manufactured and installed a bale unloader device on the machine. The district court directed a verdict for the repairer; held that, as a matter of law, Johnson was contributorily negligent; and submitted the claim against the manufacturer of the bale unloader to a jury, which returned a verdict for the defendant. We conclude that the district court's dismissal of claims against the repairer was correct, but we find a new trial of the claim against the manufacturer necessary.
 
 I. FACTS
 
 2
 On March 14, 1974, Jack Johnson was working for National Compress as a foot headtucker on a cotton compressor, a job he had held for three months. In the course of his work, his head was caught between two parts of the press, a moving part on its southeast corner and a stationary upper member of the press that had been extended by a Long Reach Model Bale Unloader manufactured and installed by Long Reach.
 
 
 3
 To operate the compress a bale of cotton is conveyed into the compressor area by a belt; then a moving lower platen rises and presses the bale against a stationary upper platen. To receive the bale, the lower platen is recessed below floor level in what is called a "pit". Two workmen perform manual operations on the bale such as the adjusting and tucking its bagging. One is stationed at each end of the compress.
 
 
 4
 When compressing a standard bale, the worker at what is called the foot of the bale, steps into the pit in order to pull into place the hooks holding the bagging and then gathers the bagging around the bale. Bales once bound no longer have hooks; if the bale requires only rebanding, it is simply compressed at a slower rate than the standard bale, and the foot headtucker may not be required to step down into the pit unless the bagging falls away from the bale.
 
 
 5
 The foot headtucker is instructed to keep one foot on the warehouse floor whenever he steps into the pit and to center himself between the huge metal arms moving overhead that supply power to the lower platen and are known as lifter links. As the lower platen rises he is to keep only one foot on it, rising with it until it reaches the warehouse floor level, when he is to remove that foot and step back so that both feet are on the warehouse floor.
 
 
 6
 As the lower platen rises, one lifter link moves from behind and to the left of the foot headtucker in the general direction of the headtucker on the opposite side. Another lifter link behind and to his right moves in the same direction. Both of the lifter links move past his head and pass within a few inches of the side of the stationary upper platen. This narrows the area between the two metal pieces so that any object between them would be pinched; hence this is called a "pinch point."
 
 
 7
 When the accident occurred there were no guards over the pinch points. Long Reach, under a contract with National Compress, had manufactured and installed a bale unloader shortly before the accident. It was not yet operational when the accident occurred, but it nevertheless shifted the pinch points so that they were closer to the work position of the foot headtucker than they were before it was installed. The foot headtucker could safely move laterally between the lifter links only 34 and 1/2 inches, and he was required to perform his duties in this very circumscribed area. Johnson was fatally injured when his head was caught in one of the pinch points while a reband bale was being compressed.
 
 
 8
 Evidence was introduced that Johnson had been instructed in the proper procedures to be followed in working as a foot headtucker and that he had initially worked under supervision. The only eyewitness to the events immediately preceding the accident testified that Johnson had stepped into the pit with both feet; he believed Johnson had not attempted to step off the lower platen as it rose up past the level of the warehouse floor; and he had observed Johnson leaning his body and projecting his head to the left in order to carry on a conversation with other members of the crew. However, at that time Johnson's head did not appear to be in a dangerous position. Nash was not watching Johnson at the exact moment he was injured and did not see whether Johnson ever attempted to step onto the warehouse floor.
 
 
 9
 Other crew members testified that Johnson had been talking and joking with the crew. Several other witnesses testified that, if Johnson had been performing his job in the established and proper manner, it would have been impossible for his head to have been caught between the lifter link and the stationary platen.
 
 
 10
 Thirteen years before, National Compress had engaged Ellis to move the compress from another location, assemble, inspect, repair, and reassemble it in the plant where Johnson was injured.[1] In repairing the machine, Ellis remachined and reworked some of the parts, and replaced others.
 
 
 11
 Susie Mae Johnson, as representative of Jack Johnson's wrongful death beneficiary, contends that both Ellis and Long Reach were under a duty to install guards for the pinch points or to warn National Compress of the danger created by them.
 
 
 12
 The trial court directed a verdict in favor of Ellis at the close of plaintiff's case on the basis that no negligence by Ellis had been shown and, as a repairer, it had no duty to warn of conditions existing on the machine at the time it was repaired if it did nothing to alter these conditions. The trial judge instructed the jury that, as a matter of law, Johnson had been negligent and that his negligence was a proximate cause of his injury and death, but he submitted to the jury the issues of whether Long Reach had been negligent and whether it was liable on the basis of strict liability. He also instructed the jury to return a verdict for Long Reach if it found that Johnson's negligence was the sole proximate cause of his injury. The jury returned a verdict for Long Reach.
 
 II. LIABILITY OF ELLIS
 
 13
 There is no evidence that Ellis was negligent. The case against it rests, therefore, on the contention that it was liable regardless of fault if the compress left its hands in an unreasonably dangerous condition, and on the companion precept that this liability extends to its failure to warn National Compress of the potential for injury created by the pinch points when the compress was in operation. This condition was not involved in Ellis' repairs and was neither created nor aggravated by it.
 
 
 14
 Section 402A of the American Law Institute Restatement (Second) of Torts (1965) provides for strict liability of the seller of a product. Mississippi has adopted this standard "insofar as it applies to a manufacturer of a product and to a contractor who builds and sells a house with the product in it," Hamilton Fixture Co. v. Anderson, Miss.1973, 285 So.2d 744, 747; State Stove Manufacturing Co. v. Hodges, Miss.1966, 189 So.2d 113, 118, Cert. denied sub nom. Yates v. Hodges, 1967, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784, but its courts have never directly considered whether the same requirement is exacted of providers of services. They have not yet ruled on whether a furnisher of services is liable, in the absence of negligence, for failure to warn of conditions that existed when it began its work and that it did not create or exacerbate. Nor, of course, have they been presented with the subsidiary question here involved, of the effect, if any, of the fact that this condition was obvious to the customer, whether or not it was equally apparent to the customer's employees.
 
 
 15
 Other jurisdictions have held repairers and other providers of services to be "sellers" within the meaning of Section 402A and subject to its rule of strict liability for injuries caused by defects in products supplied by them in the course of their services.[2] However, appellants have not cited, and we have not found, any cases in which a repairer, installer or other provider of services has been held strictly liable for failing to correct or warn of pre-existing defects in products on which they have contracted to work.
 
 
 16
 In several cases decided between 1936 and 1978, Mississippi courts have considered the liability standards that we are urged by the plaintiffs to adopt and expand. See Dunson v. S. A. Allen, Inc., Miss.1978, 355 So.2d 77; Hamilton Fixture Co. v. Anderson, Miss.1973, 285 So.2d 744; Thompson v. Reily, Miss.1968, 211 So.2d 537; State Stove and Manufacturing Co. v. Hodges, Miss.1966, 189 So.2d 113, Cert. denied sub nom. Yates v. Hodges, 1967, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784; American Heating & Plumbing Co. v. Grimes, 1941, 192 Miss. 125, 4 So.2d 890; and Mississippi Power & Light Co. v. McCormick, 1936, 175 Miss. 337, 166 So. 534. None of these decisions concerns a repairer who was not negligent. Dunson involved a manufacturer; State Stove and Hamilton Fixture involved installers of products who also supplied them or some of their component parts and who were, therefore, sellers;[3] and Thompson involved neither a repairer nor an installer, but a bailor.[4] While Mississippi Power involved a repairer, liability was based on negligence. Similarly, liability in American Heating was predicated on breach of the duty of care required of a contractor who installs a dangerous instrumentality.
 
 
 17
 The liability imposed on retailers and other distributors is narrower in Mississippi than it is in some states. It does not extend to latent product defects that they have not detected in handling the product. Sam Shainberg Co. v. Barlow, Miss.1972, 258 So.2d 242, 246; See Harrist v. Spencer-Harris Tool Co., 1962, 208 Ala. 631, 140 So.2d 558 (holding that a manufacturer or retailer has no duty to warn of a danger that is open and obvious to the purchaser of its product).
 
 
 18
 Therefore, it appears unlikely that Mississippi courts would impose strict liability for latent product defects on repairers or installers and not on retailers. Our conclusion is also supported by the refusal of a majority of other jurisdictions to impose strict liability on those who merely provide repairs and installation.[5]
 
 
 19
 Public policy grounds for subjecting the furnisher of services to strict liability have been vigorously advanced.[6] However, the reasons for imposing strict liability on a manufacturer do not apply equally to a furnisher of services upon whom liability is sought to be imposed for defects neither created nor aggravated by it. Such liability is imposed on manufacturers "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." State Stove Manufacturing Co. v. Hodges, Miss.1966, 189 So.2d 113, 120, Cert. denied sub nom. Yates v. Hodges, 1967, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (quoting Greenman v. Yuba Power Products, Inc., 1962, 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901). The seller can spread those costs among those using its products by treating them as a cost of production, and it can insure against them. Moreover, under current marketing procedures the public has a right to expect the manufacturer to stand behind its products and to assume a special responsibility to the public. Restatement (Second) of Torts § 402A, at 348-50 (1965).
 
 
 20
 In some cases an installer or repairer might be in better position than the consumer of a product to detect dangerous defects in a product, but in many cases such a contractor would not have the knowledge necessary to recognize such defects or the opportunity to detect them in the course of furnishing services. Imposing a duty to discover and warn of dangers would require them more fully to examine the products they service, and to pass on the cost of this additional service not ordered by the consumer.
 
 
 21
 Even were we to conclude that Mississippi would impose liability without fault on those who provide services, we do not think that it would make the servicer liable to warn its customers of patent dangers neither created nor aggravated by the services provided and not within the scope of the work contracted for. See Harrist v. Spencer-Harris Tool Co., 1962, 208 Ala. 631, 140 So.2d 558 (neither manufacturer nor dealer liable for injuries resulting from defect apparent to a casual observer); American Heating & Plumbing Co. v. Grimes, 1941, 192 Miss. 125, 4 So.2d 890 (dictum that an installer may not be liable for failure to warn of dangers known to his employer). Cf. Gordon v. Niagara Machine and Tool Works, 5 Cir. 1978, 574 F.2d 1182 (multifunctional general purpose power press was not per se in defective condition when marketed without guarding devices, but manufacturer breached duty to warn of characteristics of press not known to buyer and operator); Cadillac Corp. v. Moore, Miss.1975, 320 So.2d 361, 365 (requiring a retailer to correct or warn customers of defects that are not obvious to the purchaser, but are apparent to or discovered by the retailer). Ellis did not undertake to redesign the compress, but simply to repair certain specified parts and other parts that needed replacing or remachining. The existence of the pinch points was as obvious to National Compress as to Ellis; Ellis, therefore, had no duty either to eliminate or warn of this danger. There is no evidence that Ellis' installation of the compress was in any way defective. Therefore, we conclude that the district judge properly directed a verdict for Ellis.
 
 III. LIABILITY OF LONG REACH
 
 22
 Long Reach, it will be recalled, had manufactured and installed the bale unloader on the compress. That unloader was not yet functioning at the time of the fatal injury. The jury concluded that Long Reach was not negligent. We find, however, that errors were made by the district court during the trial and their effect was sufficient to warrant a new trial.
 
 
 23
 There were three principal issues: Was Long Reach negligent? Was it liable even in the absence of negligence? If Long Reach was liable for either reason, to what extent, if any, was Johnson contributorily negligent so as to reduce the award of damages under Mississippi's rule of comparative negligence? By finding Johnson contributorily negligent as a matter of law, the court not only removed from the jury's deliberations the question whether he had in fact been; it also pointed a finger of fault at him that may have encouraged the jury to minimize the possibility of liability of Long Reach. The effect of the court's action is not calculable; what it did on this issue, coupled with its action in excluding some evidence that should have been admitted, could have been prejudicial.A. Alleged Evidentiary Errors
 
 
 24
 1. Refusal to Admit Safety Publications Into Evidence
 
 
 25
 Even in diversity cases, the Federal Rules of Evidence generally govern the admissibility of evidence in the federal courts. Fed.R.Evid. 1101(b). (In some instances those rules refer back to state rules. E. g., Rule 302, presumptions; Rule 501, privileges.) Rule 803(18) provides for the admission of information taken from treatises, periodicals or pamphlets that are "established as reliable authority." We have held that safety codes and standards are admissible when they are prepared by organizations formed for the chief purpose of promoting safety because they are inherently trustworthy and because of the expense and difficulty involved in assembling at trial those who have compiled such codes. Frazier v. Continental Oil Co., 5 Cir. 1978, 568 F.2d 378, 382; Muncie Aviation Corp. v. Party Doll Fleet, Inc., 5 Cir. 1975, 519 F.2d 1178, 1183; Accord, Davis v. Fox River Tractor Co., 10 Cir. 1975, 518 F.2d 481; Wallner v. Kitchens of Sara Lee, Inc., 7 Cir. 1969, 419 F.2d 1028; Boston and Maine Railroad v. Talbert, 1 Cir. 1966, 360 F.2d 286.
 
 
 26
 At trial the plaintiff sought, without success, to have the following materials admitted into evidence: The Principles and Techniques of Mechanical Guarding Bulletin No. 497, published by the Department of Labor, Bureau of Labor Standards, 1959; Handbook of Industrial Safety Standards, published by the National Conservation Bureau Division of Association of Casualty and Surety Executives, 1945; The Safety Code for Mechanical Power Transmission Apparatus, published by the American Standards Association, 1953; and the American Standard Safety Code for Power Presses, published by the American Standard Association, 1960. In refusing to admit these materials, the court relied on Catholic Diocese v. Jaquith, Miss.1969, 224 So.2d 216, which held that governmental safety codes and regulations are admissible in evidence only when they have been given compulsory force by the state legislature, and that only treatises dealing with the "exact sciences" may be admitted.
 
 
 27
 As we have already pointed out, the admissibility of these publications was governed by federal, not state law, so the court's reliance on Jaquith was misplaced. Long Reach concedes that the American Standard Safety Code was established as a reliable authority by the testimony of an expert witness. At least two of the other publications were also admissible as reliable authorities under the federal rule and standards set forth above. In seeking the admission of information taken from these publications, Johnson specifically referred to Rule 803(18). Thus, the court's refusal to admit them is not supportable on the basis that they were not properly proffered by the plaintiff.[7]
 
 
 28
 Long Reach argues that the plaintiff was not prejudiced by the court's rejection of these publications because Johnson's experts were allowed to testify that their opinions were supported by the codes and publications of which they were aware, and one of Johnson's witnesses was allowed to read the American Safety Code's definition of a pinch point into the record and to have the definition copied for the jury. Thus the substance of these publications was effectively placed before the jury. However, if attention is directed only at whether Long Reach was negligent, without the injection of an instruction that Johnson himself was, it is difficult to conclude that the effect of the testimony was equivalent to the direct quotation of the pertinent part of each of the codes and publications. The direct quotation from a number of sources would have been more dramatic and might have been more persuasive. It is not for us to decide that the effect of what was excluded might not have altered the jury's views. Rule 103 instructs that error may not be predicated on an evidentiary ruling unless a "substantial right of the party is affected." This necessarily implies that, if there is a reasonable likelihood that a substantial right was affected, we should not find the error harmless. Compare Saltzburg, The Harm of Harmless Error, 59 Va.L.Rev. 988 (1973). Considering the manner in which this case reached the jury, we hold that there is such a reasonable likelihood.
 
 
 29
 2. Refusal to Admit Motion Picture Into Evidence or to Allow
 
 
 30
 The Jury to View the Cotton Press in Operation.
 
 
 31
 At trial Mrs. Johnson offered into evidence a motion picture portraying the normal action of a cotton compress in the processing of a standard bale. She also requested that the jury be taken to the accident site to view the press in operation. After viewing the film, the court sustained Long Reach's objection to its admission. The court also refused to allow the jury to view the press.
 
 
 32
 Rule 403 of the Federal Rules of Evidence provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Whether to admit and permit the showing of a motion picture film, or to allow a jury to visit an accident site is within the sound and broad discretion of the district court. See Fed.R.Evid. 403. See generally, McCormick's Handbook of the Law of Evidence 533-34, 537 (2d ed. 1972). However, motion pictures and other evidence that are basically cumulative in nature should be excluded. See Finn v. Wood, 2 Cir. 1950, 178 F.2d 583; DeCamp v. United States, D.C.Cir.1926, 56 App.D.C. 119, 10 F.2d 984; Pandolfo v. United States, 7 Cir. 1922, 286 F. 8.
 
 
 33
 The operation was fully described and, while the film might have been more graphic, it was cumulative. Moreover, there was a risk of undue prejudice to Long Reach in permitting the motion picture to be shown because only a small portion of it portrayed the particular part of the press involved in Johnson's accident, and it showed the guards that had been installed on the press after the accident. The same prejudice would have resulted from a visit to the site. We cannot find an abuse of discretion in the court's refusal to grant the requests.
 
 
 34
 B. Alleged Errors in Denial of Jury Instructions and in Directing that Johnson was Negligent and a Proximate Cause of his Death
 
 
 35
 The sufficiency of the evidence on any issue to make a case for jury consideration is a question of law for the trial judge. Reuter v. Eastern Air Lines, 5 Cir. 1955, 226 F.2d 443. The judge must determine whether the evidence is sufficiently in conflict to permit differing views concerning disputed issues of fact and, whether, even if the evidence is not contradicted, conflicting inferences can be drawn from it. An issue cannot be taken from the jury if there are facts on which reasonable and fair minded men and women in the exercise of impartial judgment might reach different conclusions. E. g., Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365; United States v. Fewell, 5 Cir. 1958, 255 F.2d 496. It is also clear that the fact-finding power that belongs to the jury includes the drawing and rejecting of inferences from the facts. Nunez v. Superior Oil Co., 5 Cir. 1978, 572 F.2d 1119, 1124; Winter Park Telephone Co. v. Southern Bell Telephone & Telegraph Co., 5 Cir. 1950, 181 F.2d 341.
 
 
 36
 Under Mississippi law, "momentary forgetfulness" of a known danger "is not negligence unless it amounts under the circumstances to a failure to exercise ordinary care for one's safety." Standard Oil Co. v. Decell, 1936, 175 Miss. 251, 166 So. 379, 383. As the Decell court stressed:
 
 
 37
 Regard must be had to the exigencies of the situation . . . . Circumstances may exist under which forgetfulness or inattention to a known danger may be entirely consistent with the exercise of ordinary care, as where the situation requires one to give undivided attention to other matters, or is such as to produce hurry or confusion, or where conditions arise suddenly which are calculated to divert one's attention momentarily from the danger.
 
 
 38
 Id. Cases in other jurisdictions have held that, even absent forceful directing circumstances, the forgetting of a known danger may be regarded as presenting a question of fact for the jury on the issue of contributory negligence. E. g., Kitsap County Transp. Co. v. Harvey, 9 Cir. 1926, 15 F.2d 166, 168; Austin v. Riverside Portland Cement Co., 1955, 44 Cal.2d 225, 282 P.2d 69. See generally, Annot., 74 A.L.R.2d 950, 955-56 (1960). As two commentators have noted: "(T)he tendency has probably been towards letting all but the most flagrant cases go to the jury." 2 F. Harper & F. James, The Law of Torts § 16.5, at 911 (1956); See id. § 22.10, at 1228.
 
 
 39
 After all of the evidence had been presented, the district court ruled that Johnson had been negligent and that his negligence was a proximate cause of his death. Reasonable persons, however, could differ concerning the inferences to be drawn from the facts proved and that the district court erred in its ruling taking these issues from the jury. From the evidence introduced at trial, the jury could have inferred that the accident was caused by momentary forgetfulness on Johnson's part caused by the repetitive nature and close quarters of his work, or by a circumstance diverting Johnson's attention.
 
 
 40
 The evidence showed that Johnson performed a repetitive task in a confined space allowing only 341/2 inches of lateral movement. His job required him to handle problems arising suddenly in connection with the bagging around the bales. Such a problem could conceivably have required him to step down with both feet onto the lower platen.[8] In the course of handling any problems with baling he was required to step back off the lower platen and onto the warehouse floor. It would have been easy for him to have momentarily forgotten either to step off the lower platen or not to lean to the side while working. Although no problem with the baling at the time of the accident was shown, Johnson would not have needed to step onto the lower platen unless there was such a problem.
 
 
 41
 The evidence may more reasonably lead to the inference that Johnson was not exercising reasonable care for his own safety and was injured as a result of this. It is not, however, for the trial court or for us to choose the more reasonable interpretation of the evidence. Mrs. Johnson was entitled to have the jury choose between the permissible inferences that could be drawn from the evidence.
 
 
 42
 Here again, we are urged to condone the error as not ultimately prejudicial. Contributory negligence is not a bar to recovery under Mississippi's comparative negligence law, and the jury was so charged. Thus the issue submitted to the jury was not the extent of Johnson's negligence but whether or not Long Reach was negligent in any way; and the jury rendered a judgment for the defendant.
 
 
 43
 In an abstract conceptualization of the issues, it is possible to construct a syllogism:
 
 
 44
 (a) The jury decided Long Reach was not negligent;
 
 
 45
 (b) Contributory negligence becomes an issue only if negligence is shown;
 
 
 46
 (c) Therefore, the directed verdict on contributory negligence had no effect on the verdict of negligence.
 
 
 47
 Jurors, however, are not logicians and a jury trial is not a scholastic exercise. Johnson died. Laymen might conclude that, unless his death resulted from an act of God or that chimera of tort-law, the suppositious unavoidable accident, it resulted from someone's "fault," using the term embracingly to include both negligence and strict liability. The jury was told that the Judge had decided that Johnson was at fault. The jury may have been for that reason more likely to conclude that Long Reach was not negligent than it would have been had it confronted the issue free of such instruction. Again, we cannot say affirmatively that the plaintiff was prejudiced. We are, however, satisfied that we cannot conclude that the error was harmless, and that is the litmus.
 
 C. Alleged Errors in Jury Instructions
 
 48
 Although, for the reasons we have mentioned, a new trial is necessary, we touch briefly on the questions raised concerning the jury charge because these may again arise.
 
 
 49
 1. The Court's Alleged Refusal to Instruct Jury on the
 
 
 50
 Doctrine of Strict Liability in Tort.
 
 
 51
 Johnson submitted a number of proposed instructions for the jury on the issue of strict liability that were declined by the court. The court did charge the jury:
 
 
 52
 "If you find from a preponderance of the evidence that the defendant delivered the unloader attachment for use with the press without a guard installed at the place where Johnson was fatally injured and the absence of such guard rendered the press unreasonably dangerous and that Johnson was fatally injured as a proximate result therefrom, then you should find from the plaintiff."
 
 
 53
 This instruction adequately sets forth strict liability as a theory on which the jury could find Long Reach liable. It did not require further embellishment.
 
 
 54
 2. The Court's Alleged Refusal to Instruct on Foreseeable Negligence
 
 
 55
 Susie Mae Johnson submitted a proposed jury instruction providing that "foreseeable negligence" was not a bar to the action. Because we have concluded that whether or not Johnson was contributorily negligent was a jury issue, we consider that the substance of this charge should be given when that question is submitted to the jury.[9]
 
 IV. CROSS-APPEAL
 
 56
 On cross-appeal, Long Reach asserts that the court erred in neither directing a verdict for it nor granting a peremptory instruction regarding its liability.
 
 
 57
 There was evidence that the bale unloader attachment extended the pinch points out closer to the head of the foot headtucker. There was also evidence that the attachment narrowed the width of the pinch points, thereby reducing the closure time. The only witness who testified regarding the effect of this closure stated that it was his impression that, because closure occurred so quickly anyway, installation of the unloader did not measurably reduce closure time, but his conclusion was not supported with actual measurements of closure time.
 
 
 58
 On the basis of this evidence, we conclude that the jury could have found that Long Reach contributed to the hazard posed by the pinch points. It could also have found that Long Reach's negligence, if any, was a proximate cause of Johnson's death. Therefore, Long Reach was not entitled to a directed verdict or a peremptory instruction on liability. We need not consider whether, had there been no evidence showing that Long Reach had increased the hazard posed by the pinch points, it would have had a duty to correct or warn of the danger.
 
 
 59
 For the foregoing reasons, the judgment for William C. Ellis & Sons Iron Works is AFFIRMED, and the judgment for Long Reach Manufacturing Co. is REVERSED. The case is remanded for further proceedings consistent with this opinion.
 
 
 60
 AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 The contract provided, in part:
 
 
 [2]
 
 The contractor hereby agrees to dis-assemble the Webb 80 inch high density cotton compress and equipment hereinabove described, and to transport said press and equipment to the site of the plant of Owner located at Ballaston Junction, between the cities of Drew and Ruleville, Mississippi, and to erect and assemble the press on a foundation to be furnished by the Owner. The Contractor agrees to furnish and install the following parts and attachments:
 
 
 [1]
 Complete set of brass bushings for press (any bushings not used to be credited back to you on a pro rata basis)
 
 
 [2]
 One set (4) Wm. C. Ellis heavy duty steel press posts
 
 
 [3]
 One (1) long reach rolling bale attachment
 
 
 [4]
 One (1) steel press tower. (Press tower F. O. B.). Press tower includes all structural members, but no iron for inclosing or for roof
 
 
 [5]
 Machining standard channels plate to fit rolling bale attachment
 When the press and attachments, hereinabove described, are disassembled, the Contractor will make a thorough inspection of all parts on the press. If it is found that any parts not specifically named and listed above, need replacement or need overhauling or repaired (sic), this will be at an additional cost to the Owner which will be negotiated at the time with the Owner.
 
 
 [2]
 E. g., Cunningham v. MacNeal Memorial Hospital, 1970, 47 Ill.2d 443, 266 N.E.2d 897 (hospital that supplied impure blood); Newmark v. Gimbel's, Inc., 1969, 54 N.J. 585, 258 A.2d 697 (defective hair lotion supplied by beauty parlor); Reilly v. King County Central Blood Bank, Inc., 1971, 6 Wash.App. 172, 492 P.2d 246 (blood bank that supplied defective blood). But see, e. g., Vergott v. Deseret Pharmaceutical Co., 5 Cir. 1972, 463 F.2d 12 (hospital not "seller" of needle that broke in patient's vein); La Rossa v. Scientific Design Co., 3 Cir. 1968, 402 F.2d 937, 943 (engineering firm not strictly liable for injuries resulting from its services); Lemley v. J & B Tire Co., W.D.Pa.1977, 426 F.Supp. 1378, 1379 (repairer not liable under Section 402A); Perlmutter v. Beth David Hospital, 1954, 308 N.Y. 100, 123 N.E.2d 792 (hospital not seller of blood). See generally Greenfield, Consumer Protection in Service Transactions Implied Warranties and Strict Liability in Tort, 1974 Utah L.Rev. 661, 679-86; Note, Products and the Professional : Strict Liability in the Sale-Service Hybrid Transactions, 24 Hastings L.J. 111 (1972). In the cases cited the courts have generally focused on whether the principal element of the transaction is the provision of service or the supply of the product, although this approach has been criticized. See generally id. Professionals providing services generally have not been held subject to strict liability. See id.; Sales, The Service-Sales Transaction: A Citadel Under Assault, 10 St. Mary's L.J. 13 (1978)
 
 
 [3]
 In a caveat to Section 402A, the reporter's notes indicate that no opinion is expressed as to whether it applies "to the seller of a component part of a product to be assembled." Restatement (Second) of Torts § 402A, at 348 (1965). Manufacturers of component parts have been held strictly liable in some jurisdictions. E. g., Putman v. Erie City Manufacturing Co., 5 Cir. 1964, 338 F.2d 911
 
 
 [4]
 Bailors are commonly treated as sellers. See W. Prosser, Handbook of the Law of Torts 676 (4th ed. 1971). Cf. Greenfield, Supra note 2, at 680 (lessors)
 
 
 [5]
 See, e. g., Raritan Trucking Corp. v. Aero Commander, Inc., 3 Cir. 1972, 458 F.2d 1106 (New Jersey law); Lemley v. J & B Tire Co., W.D.Pa.1977, 426 F.Supp. 1378 (Pennsylvania law); Slayton v. Wright, 1969, 271 Cal.App.2d 219, 76 Cal.Rptr. 494 (installer); McLeod v. W. S. Merrell Co., Fla.1965, 174 So.2d 736. See generally 2 R. Hursh & H. Bailey, American Law of Products Liability § 6.15 (2d ed. 1974); Greenfield, Supra n.2; Sales, Supra n.2; Annot., 29 A.L.R.3d 1425 (1970); Annot., 72 A.L.R.2d 865, 867-70 (1960); Comment, Application of Strict Liability to Repairers: A Proposal for Legislative Action in the Face of Judicial Inaction, 8 Pacific L.J. 865 (1977). Ellis did not create the pinch points; as the district court found, it was not employed to redesign the compress or to make the press safe, but to repair worn out parts. Its installation of the press also did not contribute in any way to creation of the pinch points
 
 
 [6]
 See Newmark v. Gimbel's, Inc., 1969, 54 N.J. 585, 258 A.2d 697, 701; Greenfield, Supra n.2; Note, Products and the Professional: Strict Liability in the Sale-Service Hybrid Transactions, 24 Hastings L.J. 111 (1972); Note, The Application of Implied Warranties to Predominantly "Service" Transactions, 31 Ohio St.L.J. 580 (1970); Comment, Application of Strict Liability to Repairers: A Proposal for Legislative Action in the Face of Judicial Inaction, 8 Pacific L.J. 865 (1967); Comment, Sales-Service Hybrid Transactions, A Policy Approach, 28 Sw. L.J. 575 (1974); Comment, Continuing the Common Law Response to the New Industrial State: The Extension of Enterprise Liability to Consumer Services, 22 U.C.L.A.L.Rev. 401 (1974) (in which the author proposes the application of strict liability to all service-providers by means of a shift in current views of liability and insurance). But see Sales, Supra n.2
 
 
 [7]
 Long Reach contends that these publications were improperly proffered as exhibits, while Rule 803(18) authorizes only reading into the record statements from such publications. However, Johnson's counsel simply stated that he wanted to offer them into evidence, and did not restrict his proffer to submission of them as exhibits. Although the documents were marked as exhibits, such marking is merely the customary method of identification
 
 
 [8]
 Crew members testified that riding up the platen was unnecessary and contrary to the work rules. However, Nash's testimony does not reveal any surprise or concern on Nash's part at seeing a worker riding up the lower platen with both his feet on it
 
 
 [9]
 The charge requested was:
 "The Court instructs the Jury that the foreseeable negligence of a product user is not a defense to this action. Therefore, if you should find from a preponderance of the credible evidence in this case that Jack Johnson was negligent and that such negligence, if any, was reasonably foreseeable by the Defendants, then, in that event, such negligence, if any, is not a bar to this action."